**ROMANIAN ORTHODOX MISSIONARY EPISCOPATE OF AMERICA**

v.

**TRUTZA et al.**

Civ. No. 27916.

United States District Court
N. D. Ohio, E. D.
July 8, 1952.

Owen C. Neff, John R. Vintilla, Cleveland, Ohio, for plaintiff.

Davis & Young and J. J. P. Corrigan, H. W. Hopf, Wm. P. Strangward and Glenn Cameron, Cleveland, Ohio, for defendants.

FREED, District Judge.

The plaintiff in this action, as Bishop of The Romanian Orthodox Missionary Episcopate of America, seeks to obtain undisturbed possession and control of certain real and personal property and to obtain control of the official church publication known as the *Solia* and *Solia Calendar* which he alleges the defendants have wrongfully withheld from him. He predicates his right to possession and control of this property on the contention that he is the duly ordained and consecrated Bishop of the Episcopate. He further asks relief against these defendants in the nature of an injunction to prevent them from interfering with his activities as Bishop of the Episcopate and to restrain the defendants from perpetrating any acts which would anywise injure him in his good name, fame and credit as the Bishop of the Episcopate.

The defendants deny that the plaintiff, Andrei Moldovan, is the duly consecrated Bishop of The Romanian Orthodox Missionary Episcopate of America and deny that he has any right to the possession and control of the property in question. They further deny that he has the power and authority to exercise the rights and privileges of Bishop. It is the contention of the defendants that, if the plaintiff, Andrei Moldovan, was in fact consecrated a Bishop by the Holy Synod at Bucharest, Romania, he was consecrated such Bishop of a new and wholly separate Episcopate. The defendants, by way of cross-claim, seek damages from the plaintiff sustained as the result of the possession and control by the plaintiff of certain property located in the State of Michigan and because of the publication by the plaintiff of certain unfounded charges, harmful and detrimental to the Episcopate of which the defendants claim that they are the duly elected officers. In the course of the trial, voluminous testimony was presented to sustain the respective contentions of the parties. However, the issues which require the determination of this Court may be simplified and narrowed.

The defendants contend that The Romanian Orthodox (Missionary) Episcopate of America is governed by certain by-laws adopted originally by the Church Congress of 1932 and as amended in 1947, 1948 and thereafter. It is asserted that, among other things, those by-laws contained provisions whereby the Congress of the Episcopate was empowered to elect its own bishop. According to the defendants, Bishop Policarp Morusca came to the United States in 1935, either at the instance of the Holy Synod of the Romanian Orthodox Church of Romania or its Patriarch or both. It is further contended by the defendants that in 1936, upon the suggestion of Bishop Policarp, the Church Congress approved new by-laws which provided for the election of the Bishop by the Holy Synod and consecration by the Patriarch and further provided that the Episcopate in the United States was to be administered canonically, spiritually and administratively under the direction of

the Bishop with the approval of the Holy Synod at Bucharest. Bishop Policarp returned to Bucharest in 1939 and never returned to the United States. From that time until the events here in question, there was no bishop in the United States.

The defendants claim that in 1947, because of the fear of interference and meddling by the Romanian authorities with church affairs in the United States, the Episcopate Council decided to create an autonomous episcopate and to return to the by-laws of 1932 until proper amendments could be prepared to conform to the new autonomous character of the organization. Defendants contend that on March 28, 1947, a special Episcopate Congress, assembled at Detroit, passed a resolution restoring complete administrative autonomy to the Episcopate and declaring the right of the Congress henceforth to elect its own bishop. New amended by-laws, conforming in all respects to the resolution of the special Congress of 1947 were finally adopted by the Congress of 1948, and a new autonomous espiscopate was thus created.

It is also claimed by the defendants that the plaintiff, Andrei Moldovan, not only partook of the deliberations which culminated in the new assertion of the autonomy of the Episcopate, but that, in his capacity as Secretary of the Council, he addressed the letter to the Patriarch informing him of the Council's refusal to accept one Nica as Bishop of the Episcopate. It is further contended by the defendants that in 1951, by proper action, the Episcopate severed its ties with the mother church in Bucharest, Romania, not only in respect of administrative matters, but also in respect of spiritual and canonical affairs.

The sole question for the determination of this Court, therefore, is whether or not The Romanian Orthodox (Missionary) Episcopate of America has achieved a degree of autonomy which is sufficient to permit it to elect its own bishop. If such an autonomy rests in the Episcopate here, the selection and consecration of a bishop by the Holy Synod cannot empower such bishop to obtain possession of the property in question, nor can he obtain relief such as is sought by the plaintiff here, to exercise the privileges and prerogatives of Bishop over this Episcopate in the United States. The evidence clearly establishes that such autonomy did exist under the by-laws of 1932 and that such autonomy was recreated by action of the proper officials in 1947 and 1948.

I repeat, all that this Court must determine is whether or not the Episcopate in the United States possessed administrative autonomy to elect its own bishop. The evidence is overwhelming that the by-laws in effect and duly adopted at the time the plaintiff claims to have ascended to office required the bishop to be elected by the Episcopate Congress.

Although Andrei Moldovan at the time of the hearing for the preliminary injunction not only asserted, but insisted, over and over again, that he was elected by the Church Congress in the United States, at this hearing, he specifically disclaimed any definite knowledge of his election by any group in the United States; and the Court concludes from the testimony that no doubt can possibly arise that he was not elected by the Church Congress. Not only was he not elected Bishop by the Church Congress, but he surreptitiously, and with the clear intent to conceal his activities, went to Bucharest to be there consecrated a Bishop.

The contentions of the defendants which I have recited have been clearly established. The evidence is conclusive that the Episcopate enjoyed an autonomous existence insofar as the election of its bishop is concerned. The plaintiff is not entitled to the relief which he seeks in this Court. The complaint will be dismissed at the costs of the plaintiff.

Because of the evidence which I have just recited, it is clear that the injunctive relief sought in the defendants' amended cross-claim should be granted in all respects. Therefore, the plaintiff, Andrei Moldovan, will be permanently

enjoined from representing himself as a priest or as Bishop of The Romanian Orthodox Episcopate of America, and from using the name *Solia* as the title to any publication, and from occupying or using the land, buildings and personal property located on the Vatra farm, commonly referred to as the *Vatra*, Grass Lake, Michigan, except such personal effects and personal property owned by the plaintiff, Andrei Moldovan, individually, and brought by the plaintiff, Andrei Moldovan, on the property subsequent to April 1, 1951.

The defendants' evidence fails completely to establish their right to recover damages against this plaintiff. Therefore, the cross-claim and the amended cross-claim will be dismissed insofar as they seek to recover damages from the plaintiff, Andrei Moldovan.