# ROMANIAN ORTHODOX MISSIONARY EPISCOPATE OF AMERICA v. TRUTZA et al.

## No. 11743.

United States Court of Appeals, Sixth Circuit.

May 29, 1953.

As Amended July 3, 1953.

---

John R. Vintilla, Cleveland, Ohio, Andrew W. Kops, Cincinnati, Ohio (Owen C. Neff, Cleveland, Ohio, on the brief), for appellant.

William P. Strangward, Cleveland, Ohio (Strangward, Lloyd & Cameron, Cleveland, Ohio, on the brief), for appellees.

Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a judgment of the District Court dismissing a complaint praying for injunction and equitable relief sought by plaintiff Moldovan, claiming to be Bishop of the Romanian Orthodox Missionary Episcopate of America, hereafter called the Episcopate.[1]

Since 1929 the adherents of this church, a branch of the Eastern Orthodox Church, have been building a religious organization in the United States and in Canada and have acquired certain real property at the "Vatra," Grass Lake, Michigan, which is used as headquarters of the Episcopate. A journal called "Solia" is published as the Episcopate's official organ. The amended complaint filed by Moldovan in his alleged official capacity on behalf of the Episcopate asks for surrender to plaintiff Moldovan of possession and control of the real property and for an order restraining defendants from using or expending any funds owned by the Episcopate, from publishing the newspaper, and from representing that they are acting on behalf of the Episcopate.

The defendants deny that the plaintiff Moldovan has been elected or consecrated as bishop of the Episcopate and that he has any right to possession and control of the property.

The action purports to be instituted by the Episcopate through the plaintiff Moldovan, but it clearly appears that the established Episcopate is resisting this action, for it filed an answer and a cross-claim including a claim for damages not material here which was dismissed by the District Court. The defendants are influential members of the Episcopate, the defendant

---

1. The parties will be denominated as in the court below.

Trutza being president of the Council. As such they are in possession and control of the headquarters and of the Solia, and during this period have carried on the ecclesiastical business of the organization. While the Episcopate has been known by at least six different names, until 1950 there was but one organization denominated by these names, namely, that formed in 1929, now having many parishes in the United States and Canada. This is the organization controlled by the defendants. Each party contends that it is the authentic Episcopate group and that the opposing group are schismatics or dissidents. It is conceded, however, that the group supporting Moldovan was lately formed, having met first in May, 1950, and having signed Articles of Association as an ecclesiastical corporation in the State of Michigan in June of that year. This is not the body which Moldovan claims to represent in this case. He claims to represent the body formed in 1929.

The controversy arises out of the following facts which, for the most part, are not in dispute. When the Episcopate was founded it had the power to elect its own bishop. This was customary at the time in the Eastern Orthodox Church as was shown by uncontroverted testimony with reference to the practice in Transylvania, where the bishop was elected by the delegates to the Church Congress and then approved by the Metropolitan. The same statute exists today. This right was recognized in the Episcopate by-laws of 1932. These provided that the Romanian Orthodox Church in the United States and Canada "forms an autonomous missionary episcopate maintaining spiritual and canonical unity with the Holy Synod with the Romanian Orthodox Church and organic alliance with the Romanian Orthodox Patriarchate." Article VII provided that the bishop should "be elected by the Church Congress of Parishes belonging to the Episcopate called 30 days in advance, and presided by a special delegate of the Holy Synod; the elected one—shall receive, if he meets all the canonical requirements, the canonical investiture from His Holiness the Patriarch of the Romanian Orthodox Church, in accordance with the traditions of the Orthodox Church."

The Holy Synod is a body of bishops of the Romanian Orthodox Church resident in Romania and the Holy Patriarch, the supreme executive, also resides in Romania. When Bishop Morusca was sent to America by the Holy Synod in 1935 he came at the request of the Episcopate. The Holy Synod thus recognized the autonomy of the group and its right to take action with reference to appointment of a bishop.

A Church Congress was held in 1936 at which Moldovan states that Bishop Morusca "imposed" a new statute on the Episcopate and secured the adoption of new by-laws. These by-laws provided for the election of the Bishop by the Holy Synod in Bucharest and for consecration by the Patriarch. They also provided that "The Holy Synod of the Romanian Orthodox Church is the most supreme authority pertaining to spiritual and canonical matters, and supreme forum concerning religious matters of whatever nature they may be * * *."

From 1939 when Bishop Morusca returned to Bucharest, Romania, until this controversy, no bishop of the Episcopate has resided in the United States unless the plaintiff Moldovan is a duly elected and consecrated bishop.

In 1947 the legation of the Romanian government informed the Episcopate that one Nica had been appointed Bishop of the Episcopate and in effect ordered the Episcopate to accept him. The officials of the Episcopate thereupon called a special Church Congress at Detroit which passed a resolution to restore authority to the Episcopate and to re-enact in substance the by-laws of 1932, including the right of the Church Congress to elect a bishop. In 1948 new by-laws framed in conformity to this resolution were submitted to a Church Congress and unanimously passed.

Plaintiff Moldovan, who claims now to be bishop, took part in many of these deliberations as secretary of the Episcopate and wrote the Patriarch in Romania in-

forming him of the action of the Episcopate in re-establishing autonomy.

While the testimony of Moldovan is evasive and confusing, it appears that some time in May, 1950, a second group, including priests of the Romanian Orthodox Church, nominated plaintiff Moldovan as bishop. Moldovan asserts that he was elected by the Holy Synod in Romania and consecrated by the Patriarch. At the trial Moldovan presented a telegram dated July 14, 1950, which purported to state "The Holy Synod has approved the election of Father Arch-priest Andrei Moldovan to the vacant seat of bishop."

The District Court held that but one question was presented, namely, whether the Romanian Orthodox Missionary Episcopate had achieved a degree of autonomy sufficient to permit it to elect its own bishop. The court held that such autonomy did exist under the by-laws of 1932 and was recreated by action of the proper officials in 1947 and 1948. Since the by-laws of 1932 required the bishop to be elected by the Church Congress, the District Court denied the injunctive relief sought by plaintiff Moldovan and permanently enjoined him from representing himself as a priest or bishop of the Romanian Orthodox Episcopate of America, from using the name "Solia" as the title to any publication, and from occupying or using the land, buildings and personal property located on the Vatra farm, Grass Lake, Michigan.

Plaintiff urges that this holding was clearly erroneous. It is contended that the Episcopate is part of a central organized church and that the Holy Synod and the Patriarch have the exclusive power of electing, consecrating and investing a bishop. It is asserted that Moldovan was duly elected and consecrated and that plaintiff organization and plaintiff Moldovan as bishop hold title jointly to "Vatra." It is further contended that the election, consecration and investiture of Moldovan constituted a decision by the Holy Synod on a matter of internal church government and as such are binding on the civil courts of this country. The plaintiff cites several state decisions in support of these propositions and relies principally upon Watson

v. Jones, 13 Wall. 679, 20 L.Ed. 666, and Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America, 344 U.S. 94, 73 S.Ct. 143.

While the cited holdings state the general law upon the subject, we do not discuss them in detail because we think they do not govern the present controversy. In the Kedroff case, supra, which was announced after the instant case was decided in the District Court, the Supreme Court held that legislation which determines in a hierarchical church the ecclesiastical administration or appointment of the clergy, or transfers control of churches from one group to another, interferes with the free exercise of religion contrary to the Constitution. Here no ordinance, statute or congressional enactment is involved. This is not a case of legislation claimed to be violative of the First Amendment to the Constitution of the United States. It is a controversy between the American and Canadian church group and the Communistic government in Romania working through the hierarchy.

The controversy arose after the adoption of the by-laws of 1936 through the appointment of a bishop by the government of Romania. This is conceded by Moldovan, who stated that the president in the regular meeting of February 21, 1947, read "an official letter received from the Romanian Legation, Washington, D. C., which says that the bishop for the American Romanians was named in the person of Dr. A. Nica and notifies us to receive him." A protest against this action was sent by cablegram to the Patriarch and also to the Minister of Cults of the government of Romania. On the same day the council voted to suspend the 1936 statutes and to put into force the statutes of 1932, restoring autonomy and the right of the Episcopate to elect its bishop.

Moldovan, who was secretary of the council, explained this action to the Patriarch Nicodemus at Bucharest, Romania, in a letter dated April 30, 1947. After protesting the loyalty of the Episcopate, Moldovan continues:

"By virtue of this loyalty, we have been opposed not to the Holy Synod,

not to your Beatitude neither to His Grace Bishop Nica,—of whose integrity and Arch-priestly (hierarchical) worthiness we have no doubt,—but against the meddling of the political power in the affairs of the Church. That is why our Church Congress, held on March 28, 1947, resolved to abrogate the Statute, which was imposed upon us by His Grace the Bishop of The Western Un-Orthodox Countries (i. e., Policarp), which (Statute) had made of us a section of an Episcopate created outside the boundaries of the United States,—and (decided) to return to the original Statute which had been approved by the Holy Synod in November 1929. In conformity with the provisions (dispositions) of this Statute and with those of the High Decree No. 10,219 of November 1st. 1930, we have been granted autonomy and the right to elect the Bishop, a right enjoyed by other Episcopate's too, without harming by this, in any measure, the canonical tie with the Mother Church.

"As eloquent proof of our wish, the very same Church Congress requests, unanimously, with all the humbleness of Your Beatitude, who are our Metropolitan, to kindly consent and communicate to us a list of candidates who are worthy of your high trust, without the meddling of the Government, and who possess pronounced qualities of a real (true) Parent, so that we can fill the vacant bishopal chair, in the Congress which is convening for this purpose on the 4th of July, 1947, at the Romanian Vatra."

It does not appear that such a list was submitted.

In conformity with the resolution of 1947 the duly elected Church Congress of 1948 unanimously passed extensive by-laws which contained the following statement:

"*Art 2. Character.*—By the will and through the unanimous decision of the Congress of the parishes, this Episcopate is and shall remain *Autonomous* having the right to regulate (leg-islate) to administer and conduct, through its legally constituted (elected and instituted) organs, all its religious, cultural and financial affairs, in conformity (accordance) with the Canons and Laws of the Orthodox Church, in general, and in accordance with the dispozitions of this Statute and with the decisions of the Episcopate's Church Congresses, in special,—respecting in its entirety the Constitution of the Countries in which this Episcopate has (exercises) church (religious) jurisdiction.

"In regards to spiritual, canonical and dogmatic aspects the Episcopate preserves its unity with the Ecumenical Church of the East,—in general,—and, in special, with the Autokephalos Orthodox Church of Romania."

It was after this action that the group supporting Moldovan split off from the Episcopate, set up its schismatic body and nominated Moldovan as bishop. The council of the Episcopate then determined to take legal action to protect the Episcopate, both in its property and in its canonical privileges and in its meeting of November 16, 1950, unanimously decided that every member of the council should sign "a Declaration of loyalty to the Episcopate, rejecting any foreign meddling * * * in the spiritual and administrative affairs."

The final action was taken at a special Church Congress of the Episcopate held at Chicago on July 1, 2, 3 and 4 of 1951, in which various resolutions were adopted reasserting the autonomy of The Romanian Orthodox Missionary Episcopate of America and changing its name to The Romanian Orthodox Episcopate of America. Among the resolutions adopted were the following:

"1. Whereas the Romanian Orthodox Parishes and The Romanian Orthodox Episcopate of America have all been organized, supported and maintained by the faithful members Romanian Orthodox Faith, citizens or residents of the United States and of The Dominion of Canada,—

"2. Whereas, in order to assure the canonical continuity and the Apostolic

succession of The Holy Eastern Orthodox Church, The Romanian Orthodox Episcopate of America, at the time of its organization had asked to become a component part of the Orthodox Church of Romania, and, at the same time, had reserved for herself the right to administer and to conduct her own affairs autonomously, through properly constituted Church-Congresses, composed of the delegates of the parishes and also the exclusive right to nominate and elect its own Bishop,—

"3. Whereas, following the installation in Romania of a Communist, dictatorial, anti-christian and anti-democratic government,—the Orthodox Church of Romania:

"(a) is no longer free to preach the Word of God nor to propagate the true teachings of the Holy Eastern Orthodox Church and her Faith,

"(b) with complete disregard for the organizational Statutes of our Episcopate, continues to meddle in problems, the solution of which is the exclusive right of the members of our Episcopate,

"(c) through her present leadership, completely enslaved by the political rulers propagates, among our faithful peoples here, ideas which are contrary to the free life conceptions and ideals held and respected by the American citizen,

"Now, therefore, BE IT RESOLVED that:

"1. The Romanian Orthodox Episcopate of America be and the same is hereby declared to be *completely autonomous* not only in its administrative but also *in its canonical* (spiritual) affairs, and thus free from all rules, regulations, orders, decrees, etc., emanating from the Patriarch or from the Holy Synod of Romania."

■ We think that these facts present a situation not covered by any decision cited by the plaintiff. The original group established in 1929, although autonomous, was willing to accept the authority of the Holy Synod and so expressed itself in the by-laws of 1936, but in 1947 it discovered that it was dealing, not with the Holy Synod and the Patriarch, but with the Communistic government of Romania, which was dictating the appointment of its bishop in the United States of America and Canada. It discovered that the controlling and principal party to the agreement of 1935–6 was totally different from the one with which it thought it had been dealing. We agree with the District Court that under these circumstances the defendants were entitled to revoke their previous by-laws and to re-establish the by-laws of 1932. We also think that this conclusion is in accord with the spirit, if not with the letter, of the Kedroff case, which declares that "Freedom to select the clergy, where no improper methods of choice are proven * * * must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." Since this is true as to protection against the interference of an individual American state, we think it should be equally true as to protection against the domination and interference of a foreign state.

■ The decision must in any case be affirmed upon the ground that the plaintiff Moldovan has not borne the burden of proof in showing that he has been elected or consecrated as bishop of the Episcopate.

The only evidence as to the election of Moldovan as bishop, by the Holy Synod is his own inconsistent, contradictory testimony and certain unauthenticated papers which he presents to support his story. One of these documents has the name "Justinian" at the top and bears a signature purporting to be that of the Patriarch Justinian *locum tenens* in Bucharest. Typewritten extracts of speeches which Moldovan states he made in Bucharest at the time of his claimed election are also included. The claimed speeches are entirely self-serving.

A deception which he practiced upon his parishioners in Akron, Ohio, also seriously affects his credibility. In 1950, Moldovan announced to his parish in Akron, Ohio, that he was going to Hot Springs, Ark., for his health. He arranged to mail post

cards signed by himself from Hot Springs, Ark., to members of his parish in Akron. Three of these post cards included in the record are dated November 3, 1950; but Moldovan's passport for travel to Romania, also in evidence, was issued August 22, 1950, and valid for three months up to November 21, 1950. On November 10, 1950, the passport was extended for a period of one month by the American Legation at Bucharest. Moldovan claims that he was in Romania at about the time that he was sending post cards from Hot Springs, Ark., to his parishioners in Akron. The possibility of error or fraud in self-serving or hearsay statements purporting to constitute evidence of official acts performed in a country thousands of miles distant and separated from the United States by the Iron Curtain is self-evident.

The record is replete with Moldovan's inconsistent and contradictory statements and repeated evasive answers.

The District Court commented upon Moldovan's evasiveness and the sharp changes of front manifested in his testimony. The factual conclusions of the District Court are strongly supported by the record. A drastic remedy like injunction should not be issued upon such flimsy proof. As Moldovan has not shown himself to be a bishop elected either by the Church Congress, by the Holy Synod or by any ecclesiastical body of the Romanian Orthodox Missionary Episcopate he is not entitled to the relief sought.

The judgment of the District Court is affirmed.