Chief Judge Conway.
Two groups contend in this action for the right to the use and occupancy of St. Nicholas Cathedral in New York City. Both partake of the doctrine, creed and spiritual heritage of the Russian Orthodox Church, which is one of a loose association of eastern orthodox churches tracing a common origin and existence to the year 1054 when the Patriarch of Constantinople ceased to recognize the authority of the western or Roman church. In time, the Patriarch of Constantinople acknowledged various branches of the church in other nations as ‘ ‘ autocephalous ’ ’ or completely independent for purposes of government and administration. The Russian Orthodox Church, with its own Patriarch of Moscow, achieved the status of autocephaly in the 16th Century.
The Russian Orthodox Church was ruled by the Patriarch of Moscow until 1700 when Peter the Great established a Most Sacred Governing Synod to rule in place of a Patriarch. Throughout Czarist times, the church appears always to have had a very close connection and relationship with the civil authorities, having been supported by State subsidies and having as a member of the Holy Synod a Chief Procurator appointed by the Czar to protect and effectuate political interests.
*198 To serve the religious needs of Russian immigrants, the Russian Orthodox Church, then ruled by the Holy Synod, established the Diocese of Alaska and the Aleutian Islands, later known as the Diocese of North America and the Aleutian Islands, in the latter part of the 19th Century. St. Nicholas Cathedral, the subject matter of this controversy, was built in 1903 as a parish church of the diocese and became a cathedral in 1905 when the See of the diocese was moved from San Francisco to New York.
Synodal rule of the church was terminated and the Patriarchal form of organization was reinstated by a “ Sobor ” or convention of the Russian Orthodox Church held in Moscow in 1917-1918 and which was convened in the brief interval of freedom between the overthrow of the Czarist regime and the rise of the Bolsheviks. That sobor, which is conceded by all to have been canonical and valid, elected one Tikhon as Patriarch of Moscow. Shortly after Tikhon’s election, when the Communists came to power, there commenced a long campaign' of harassment and persecution aimed at eradicating the church from Russian life.
Upon the occurrence of a vacancy, Patriarch Tikhon appointed one Archbishop Platon as head of the North American Diocese. The appointment was made verbally at first, in view of the difficulty in transmitting such a communication out of Russia, but later, in September, 1923, it was confirmed in writing. At that time, the persecution of the church in Russia by the Soviet Government was at its peak of violence and virulence: The Communists, of course, were militant atheists committed to the doctrine that religion is the opiate of the people. Moreover, many of the ruling clergy, having held positions of importance under the Czar, were obviously counterrevolutionary in outlook and belief. The Soviet Government, therefore, attacked the church with every means available, both directly, through confiscations, arrests, imprisonments, exiles and executions, and, indirectly, through cultivation and support of divisive and dissident elements within the church. As a result, by this time, the activity and authority of the Patriarch in Moscow had virtually ceased to exist.
The North American Diocese, clergy and faithful, were bewildered and confused at the inconsistent and improbable reports and orders emanating from Moscow. For example, only *199 five months after his appointment by Patriarch Tikhon, a document appeared here purporting to have been issued by Tikhon which dismissed Platon as archbishop for engaging in counterrevolutionary “acts * * * directed against the Soviet.” There remains grave doubt as to whether the Patriarch really issued such a document, at least as his own voluntary act. In any event, it had become clear to the North American Diocese that the Patriarch and the church administration in Moscow were no longer in effective control of the church. In addition, as we shall see, imposters were appearing in this country seeking to seize control of the administration of the diocese, and all its properties and temporalities.
The perils and uncertainties then existing prompted Archbishop Platon, still recognized and revered by the American clergy and faithful, to call a sobor of the North American Diocese at Detroit in 1924. The sobor concluded that Patriarch Tikhon was under coercion and duress by the Communists, that failure to act would result in anarchy for the North American Diocese and that it was necessary for the diocese to create its ‘ ‘ own firm Church administration, completely insured against possibility of the direct or indirect influence of the Soviet power.” A resolution was adopted asking Archbishop Platon to head the administration of the church. Another resolution stated it to be the will of the sobor “ Not to break at all the spiritual ties and communion with the Russian Church, but always to pray for her good ”.
The Detroit sobor of 1924, in effect, declared that the North American Diocese (or Metropolitan District, as it came to be called) should exercise administrative autonomy free of the Patriarchate with the right of local election of its bishops. This declaration of autonomy was made under a previous ukase or order of the Patriarch issued in 1920 which permitted dioceses to organize on a local basis in the event the activity of the Patriarchate should stop and in the event such cessation of activity should acquire a protracted or even permanent character. During the imprisonment of the Patriarch, the substance of the ukase was repeated in a circular letter sent to all dioceses on behalf of the Patriarch in 1922 directing local hierarchs to “ administer your archdiocese independently, in accordance with the Holy Writ and the holy canons; and until the restitution of *200 the Supreme Church government decide definitely all affairs about which formerly you were wont to request the decision of the Holy Synod.” The ukase of 1920 had also provided that all local measures were to be submitted for confirmation to the “Central Church Authority” when it is re-established. The Detroit sobor, in establishing the Metropolitan District here, thus stated that the final regulation of questions arising from the relationship of the Russian church and the North American Church would be left to a “ future Sobor of the Russian Orthodox' Church which will be legally convoked, legally elected, will sit with the participation of representatives of the American Church under conditions of political freedom ’ \
Patriarch Tikhon died the following year, 1925. He had provided that the administration of the church, following his death, should be in the hands of a “ locum tenens ” or “ guardian of the Patriarchial Throne.” He had nominated the person so to act, plus an alternate, but by reason of arrests and exiles neither of the named individuals was able to serve for any significant period. They in turn had named further appointments, and, ultimately, there emerged one Sergei who as deputy of the locum tenens became the de facto leader of the church in 1926.
There followed a period of struggle and adjustment between the Soviet State and the church as led by Sergei. He was imprisoned, but later released after he had, in 1927, entered into a modus vivendi with the Soviet under which the Patriarchal church, in return for legal recognition, gave its pledge of loyalty to the government both on behalf of the church in Russia and the church abroad. He “ demanded from the clergy abroad a written promise of their complete loyalty to the Soviet government in all their public activities. Those who fail to make such a promise, or to observe it, shall be expelled from the ranks of the clergy subject to the Moscow patriarchate ”. The agreement amounted to a capitulation by Sergei to the Soviet, but under it, or because of it, Sergei was able to act as leader of the Patriarchal church in Russia over the next, decade, despite the continuance of strong antireligious propaganda and repressive action on the part of the Communists.
During this period, in 1934, Sergei, as locum tenens, issued a condemnation against the declaration of administrative autonomy adopted by the Metropolitan District in 1924. He placed *201 Archbishop Platon and his successor, Archbishop Theophilus, under a prohibition and appointed Benjamin Fedchenkoff to come to America to establish a diocese subject to the jurisdiction of the Patriarchate. Sergei’s insistence upon a pledge of “ loyalty ” to the Soviet regime was abhorrent to the members of the Metropolitan District and the overwhelming mass of the clergy and faithful here continued to adhere to the Metropolitan District which grew and prospered in ensuing years.
A subsequent effort at rapprochement between the Patriarchate and the Metropolitan District was made in 1945. Following the patriotic support and service rendered by the Patriarchate to the State during the invasion of Russia by Germany, Stalin permitted a sobor to be convened in Moscow in 1943 which elected Sergei as Patriarch and, upon his death, in 1945 another sobor was called. Delegates from the Metropolitan District of America were invited but were prevented from reaching Moscow until after the sobor had adjourned.
They there found that Alqxei had been elected Patriarch. In previous negotiations, while he was locum tenens under Sergei, Alexei had made it clear that any reconciliation would have to be predicated upon “ the demand of the fullest loyalty, that is, complete abstention from attacks on the Soviet Power, is -not a political, but an ecclesiastical condition.” (Emphasis is Alexei’s.) When the American delegates sought to obtain from Alexei, as Patriarch, a lifting of the spiritual separation from the church in Russia on terms of autonomy for the American group, Alexei renewed his demand for a pledge of abstention from political activities and also imposed a requirement of Patriarchal confirmation of the election of an archbishop to replace Theophilus who was apparently to be deposed.
The American group viewed the provision regarding abstention from political activities as tantamount to a pledge of loyalty to a foreign power. Moreover, there was as yet no clear evidence that the subjection of the Patriarchate to an atheistic government— the condition which occasioned the original declaration of autonomy — had in any way ceased or changed. Thus, they felt that acceding to Alexei’s insistence upon ultimate authority over the Metropolitan District (as evidenced by the demand for the right to confirm candidates for bishop together with the right to reward the clergy with higher titles and the right of *202 appeal) would result in acceptance of a hostile and irreligious control over the American church. In view of the failure of this and later attempts at reconciliation, the Moscow Patriarchate has on different occasions issued orders excommunicating the leaders of the Metropolitan District.
In 1945 this action was commenced by the Metropolitan District to obtain the use and occupancy of St. Nicholas Cathedral. The action was brought against an individual, John Kedroff. who was then in possession of the cathedral but who was not affiliated with either the Metropolitan District or the Moscow Patriarchate. Rather, he was a relict of the so-called ‘ ‘ Renovated ” or “ Living ” church, a clique of radical priests in Russia who, disgruntled and ambitious, were organized and supported by the Communists between 1918 and 1927. Because of this active assistance on the part of the Soviet Government, the living church had been able to depose Patriarch Tikhon and seize control of the church administration in Moscow — one of the factual conditions which, as we recall, led to the establishment of the Metropolitan District here.
The living church was relatively short-lived because it had no real popular support and it was eventually abandoned by the Soviet Government after Sergei capitulated in 1927. ■ Nevertheless, during its existence, the living church had attempted to extend its jurisdiction over the North American Diocese by appointing one John S. Kedrovsky (the father of the John Kedroff above mentioned) as Archbishop of North America. Kedrovsky promptly commenced an action here to oust Archbishop Platon from the cathedral. Then, as now, information as to conditions in Russia was difficult to come by. In that action, Kedrovsky, the representative of a splinter group organized by an atheistic civil authority in Russia, was able to prevail over the rightful Archbishop Platon and wrested control of the cathedral from him. The judgment which put Kedrovsky in possession of the cathedral was affirmed by this court by application of the rule (enunciated in the case of Watson v. Jones, 13 Wall. [80 U. S.] 679, 724-727) that, in an ecclesiastical dispute involving a denominational church, the decision of the highest church judicatories will be accepted as final and conclusive by the civil courts. (Kedrovsky v. Rojdesvensky, 242 N. Y. 547.)
*203 The instant action was, therefore, brought against John Kedroff and since he, as successor to Kedrovsky, the appointee of a nonexistent church, had no defense to the ejectment action, he sought out Benjamin, the Archbishop appointed by the Patriarchate, who reordained Kedroff as a priest, whereupon he “gave” the cathedral to Benjamin who was joined as a defendant in the action.
When the case reached us in 1950, the courts below had given judgment to the defendants by applying the rule of Watson v. Jones (supra). We reversed that judgment, dividing our consideration of the case into two phases, one based upon common-law grounds and the other upon a specific statute which the Legislature had enacted in 1945, just prior to the commencement of this action, to govern the situation. (Religious Corporations Law, §§ 105,107.) Since the statute, in terms, clearly evidenced a legislative intent to confirm the Metropolitan District in the possession, use, control and occupancy of St. Nicholas Cathedral, we reversed and granted judgment for the plaintiff, commenting that, in any event, a new trial would have been required on common-law grounds. (St. Nicholas Cathedral v. Kedroff, 302 N. Y. 1, 24.)
Upon appeal to the Supreme Court of the United States, our decision on the- statutory ground was reversed, and the case remanded for further proceedings not inconsistent with the opinion of the Supreme Court. The majority there adopted the view that sections 105 and 107 of the Religious Corporations Law, as construed, constituted “ a transfer by statute of control over churches ” and was beyond the legislative power of the State of New York, violating the constitutional rule against prohibition of the free exercise of religion. (Kedroff v. St. Nicholas Cathedral, 344 U. S. 94, 110.)
Upon the remand, we refused to direct final judgment in favor of the appointees of the Moscow Patriarchate. Instead, we ordered a new trial concluding that, although the Supreme Court had authoritatively eliminated the statutory base for decision, the alternative or common-law ground was still valid and unimpaired. (St. Nicholas Cathedral v. Kedroff, 306 N. Y. 38.)
We held that the ultimate and determinative issue to be tried was as to the domination of the Patriarch by the Communist government (396 N. Y., pp. 46-47; see, also, dissent, p. 56); as to *204 whether the appointees of the Patriarchate were “ mere puppets of a monolithic and atheistic secular power ” (306 1ST. Y., p. 51); and as to whether “ the Patriarchate, though nominally re-established, cannot function except as an arm or agent of an anti-religious civil government ” (306 N. Y., p. 53). We emphasized this point, namely, that the mere existence of a nominal church organization in Russia could not be enough to satisfy us that its appointees would be the proper trustees to administer the cathedral if the Patriarchal church had been absorbed by the Soviet Government and its actions deprived, during the period of such domination, of any religious significance. To permit such a result would constitute an infringement on the right of free exercise of religion on the part of the Metropolitan District and would retard rather than advance the end of religious liberty by ‘1 requiring the communicants of the metropolitan district to acknowledge the administrative rule of persons whom they believe are mere puppets of a monolithic and atheistic secular power ”. (306 N. Y., p. 51.)
To repeat, the issue to be tried was as to the domination of the Patriarchate by the Communist government. Such reiteration is necessary since the Trial Justice and the dissenting opinion here- prefer to treat the case as involving only whether the Patriarchate “ is the head of a functioning religious order”, paraphrasing out of context portions of our prior opinions. Of course, there never has been any question as to the existence in Moscow of an apparatus known as the Russian Orthodox Church and of an individual known as the Patriarch. The intervention of his appointee in this action is proof of his existence if proof were needed. To demonstrate, therefore, that the Patriarch exists and functions is merely to prove what is not disputed and results in obscurement of the real issue on which we ordered a new trial, namely, as to the subversion of the Patriarchate into an instrumentality of the Kremlin.
That new trial has now been had and, on the record and exhibits, we think that the domination of the Patriarchate by the Communist government, and the necessary subservience of the church in Russia to the Soviet State have been conclusively proved and confirmed so that, as between the archbishop appointed by the Patriarch and the archbishop elected by the Metropolitan District, the latter has demonstrated its right to the use, occupancy and control of St. Nicholas Cathedral.
*205 No one disputes that, prior to any time of trouble or dissension, St. Nicholas Cathedral had been dedicated as the See of the North American Diocese of the Russian Orthodox Church and was to be used and controlled by the archbishop of the diocese who was in turn appointed by and subject to the Holy Synod in Moscow or, in 1918, the Patriarch of Moscow.
Neither can it be disputed, however, that the cataclysmic events in Russia following the revolution there necessarily wrought a profound change in the status, government, organization and administration of the church. It seemed clear on the earlier record, and it is now beyond doubt, that the 1 ‘ general ’ ’ or central authority of this church, the Moscow Patriarchate, persecuted as it was by the Communists, had ceased to exist as an operative and functioning entity by 1924 when the Detroit sobor of the North American Diocese declared its autonomy and assumed the right of local election of its archbishop.
The action was properly taken in pursuance of the Patriarchate’s own grant of authority as evidenced by the ukase of 1920, but, even in the absence of such express authorization, there would have been inherent power in the leaders and faithful of the North American Diocese to protect their property and temporalities against diversion and dissipation by hostile elements operating independently or through the mechanism of a captive Patriarchate. After all, religious property such as St. Nicholas Cathedral was subject to the implied trust that it must be used and employed according to the discipline, rules and usage of the Russian Orthodox denomination and for the benefit of the members of its North American Diocese. The circumstances from 1918 to 1924 clearly warranted the inference that continued control of the property and temporalities of the North American Diocese by those then acting for the Moscow Patriarchate would have resulted in a diversion of the property from this implied trust.
If the Patriarchate had announced its conversion to atheistic communism at that time, no one could rationally contend that the principle of denominational control of property would have required that American churches he turned over for use as anti-religious museums as was done in Russia. In that event, the faithful of the North American Diocese would have had the legal *206 right, indeed, the duty, to see to it that such a broad fundamental departure by the “ general ” or central authority from its essential principles did also not entail the diversion of property from the accustomed use of those adhering to the denominational usage and for whom it was originally dedicated under conditions of implied trust.
What occurred in 1924 was different in degree and clarity, of course, but not in nature. The Patriarchate was being subjected and subordinated to an antireligious civil government. Sergei’s capitulation, his so-called modus vivendi with the Communists, merely completed a process begun in 1918. What emerged was fundamentally different from what had been before. Was the change permanent? Was the Patriarchate, in its new condition of subservience to antireligious rulers, incapable of fulfilling its prior functions? The North American Diocese did not know for certain but they prudently did not delay action until they were divested of all their property.
Under the circumstances then existing, this court must hold that the Detroit sobor of 1924 properly and legally established the administratively autonomous Metropolitan District, with provision for local election of its own archbishop, and for control and use of the properties of the former North American Diocese. The rule of Watson v. Jones (supra) does not and cannot control in a situation in which the conduct, composition or action of the governing body is such that, if given effect as to property rights, there would result a real and substantial departure from and a perversion of the implied trust to which the property is subject.
A recent illustration of this principle is found in a case strikingly similar to that at bar, Romanian Orthodox Missionary Episcopate of America v. Trutza (120 F. Supp. 183, affd. 205 F. 2d 107 [0. A. 6th], cert, denied 346 U. S. 915), which involved an action commenced by a bishop who had been consecrated as such by the Holy Synod and the Patriarch of Bomania in Bucharest and sent here to assume jurisdiction over the Bomanian Orthodox Church in America. In the action, the appointee of the Patriarchate sought to obtain possession and control of land, buildings and funds of the American church.
It was undisputed that by-laws of the American group had been adopted in 1935 providing for the election of the American bishop by the Holy Synod in Bucharest and that the church in *207 America was to be “ administered canonically, spiritually and administratively under the direction ’ ’ of the bishop with the approval of the Holy Synod at Bucharest. This, it is clear, presents a picture of a denominational church with a ‘ ‘ general ’ ’ or central authority, almost exactly parallel with the prerevolutionary condition of the Russian Orthodox Church here.
In 1947, as recited by the Trial Judge in the Trutza case (supra), “ because of the fear of interference and meddling by the Romanian authorities with church affairs in the United States ”, the American group, through its leadership, the Episcopate Council, “ decided to create an autonomous episcopate ”. This was confirmed by a special Episcopate Congress in Detroit which passed a resolution i 1 restoring complete administrative autonomy to the Episcopate and declaring the right of the Congress henceforth to elect its own bishop.” (120 F. Supp. 183,184-185.)
The Court of Appeals set forth at length a resolution adopted by the American Episcopate Congress (akin to the resolutions adopted by the Metropolitan District of the Russian Orthodox Church) justifying the declaration of autonomy on the ground that, ‘ ‘ following the installation in Romania of a Communist, dictatorial, anti-christian and anti-democratic government,— the Orthodox Church of Romania:
“ (a) is no-longer free to preach the Word of God nor to propagate the true teachings of the Holy Eastern Orthodox Church and her Faith,
“ (b) with complete disregard for the organizational Statutes of our Episcopate continues to meddle in problems, the solution of which is the exclusive right of the members of our Episcopate,
“ (c) through her present leadership, completely enslaved by the political rulers propagates, among our faithful peoples here, ideas which are contrary to the free life conceptions and ideals held and respected by the American citizen,
“ Now, therefore, BE IT RESOLVED, that: 1. The Romanian Orthodox Episcopate of America be and the same is hereby declared to be completely autonomous not only in its administrative but also in its canonical (spiritual) affairs, and thus free from all rules, regulations, orders, decrees, etc., emanating from the Patriarch or from the Holy Synod of Romania.” Both the Trial Judge and the Court of Appeals held that the American *208 group through its Congress was entitled to revoke the by-laws which gave the Holy Synod and Patriarch in Bucharest the power of appointment of American bishops and to assume autonomous status, still retaining control, use and possession of the properties and funds of the Romanian Orthodox Church here. At the time the by-laws were revoked, said the Court of Appeals, the American group had £ ‘ discovered that it was dealing, not with the Holy Synod and Patriarch, but with the Communistic government of Romania, which was dictating the appointment of its bishop in the United States of America and Canada. ’ ’
The court continued (205 F. 2d, supra, p. 112): ££ We agree with the District Court that under these circumstances the defendants [the American group] were entitled to revoke their previous by-laws and to re-establish the by-laws of 1932. We also think that this conclusion is in accord with the spirit, if not with the letter, of the Kedrofif case [i.e., the instant St. Nicholas Cathedral case on appeal to the Supreme Court, 344 U. S. 94] which declares that £ Freedom to select the clergy, where no improper methods of choice are proven * * * must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference.’ Since this is true as to protection against the interference of an individual American state, we think it should be equally true as to protection against the domination and interference of a foreign state.” (Emphasis supplied.)
The Trutsa case (supra) and the one at bar are virtually on all fours, the only difference being that the American group of the Romanian Orthodox Church had originally been autonomous and had accepted the denominational control of the Synod and Patriarch of Bucharest in 1935 surrendering their right of local election of bishops. Nevertheless, upon adoption of the new by-laws in 1935, the American group clearly assumed a status in relation to the Patriarch of Bucharest identical with that held by the North American Diocese in relation to the Patriarch of Moscow in 1918. The two cases necessarily involve the same essential question, namely, whether a former diocese or dependency of a foreign mother church can declare its autonomy and retain its temporalities in the face of the radically changed status, control and composition of the mother church as a result of political factors.
*209 The Court of Appeals answered that question in the affirmative and the Supreme Court of the United States, despite the citation of its decision in St. Nicholas Cathedral v. Kedroff (supra), denied certiorari (346 U. S. 915). By this action, which permitted the American adherents of the church to retain their temporalities free of the former central authority, it would seem that the Supreme Court recognized what a majority of this court has always recognized, that, with respect to religious properties within their jurisdiction, American courts have a responsibility and duty to prevent seizure and control by agents of a foreign atheistic State acting in the name and guise of a church administration they have infiltrated and subverted. What worse violation of the religious liberties of our people can be envisioned than to require that they subject themselves to the ecclesiastical rule of persons acting for a godless foreign regime as the price of continued use of their churches!
On the facts of the instant case, and on the reasoning of the Trutsa case (supra) in a parallel situation, we think that religious properties of the former North American Diocese should remain subject to the control, use and occupancy of the faithful here, and of their duly invested clergy, following the declaration of administrative autonomy by the Detroit sobor of 1924.
This could probably have been decided as a matter of law on the record of the first trial herein, on the first appeal or upon the remand by the Supreme Court. There remained, however, some uncertainty as to the condition and status of the Moscow Patriarchate and its relationship with the Soviet State during and after the World War. This action was first tried in 1947 and, apart from other insufficiences of proof, was too close in time to the events involved to provide the proper predicate for final determination. We, therefore, ordered a new trial as set forth earlier.
We have seen that Alexei was elected Patriarch of Moscow at the sobor of 1945 succeeding Sergei who had died. It is a matter of history that when the Soviets were fighting for survival during the World War, and in view of defections by the populace to the German invaders who had opened the churches and proclaimed freedom of worship, Stalin granted concessions to Sergei and received in return the patriotic support of the *210 Patriarchate throughout the war. It is clear that some sort of a bargain was struck, then and since, whereby the Patriarchate was permitted to exist and function on a limited scale in return for some service which it might render to the Soviet State. Of course, we can never hope to know precisely what the terms of the bargain were. The new trial does, however, shed some light in our effort to ascertain the postwar relationship between the Patriarchate and the Communists.
What we see is a picture of the church and its leaders permitted a nominal existence and observance of religious rites within Russia on a narrow scale. We see further certain evidences of religious feeling and interest on the part of a portion of the Russian people. On the other hand, there is overwhelming and conclusive evidence that this nominal existence and the performance of these rites are permitted by the Soviet Government simply as a matter of expediency, that the Patriarchate either willingly or as the price of survival serves the aims, purposes and objectives of the Soviet Government at home and abroad, and that, within the framework of our prior decisions in this case, no essential change has occurred in the Moscow Patriarchate since 1924 and the establishment of the Metropolitan District here, which would now vitiate or impair the declaration of autonomy then validly made.
In the light of the evidence and the realities of the case, it must be held that the Moscow Patriarchate now exists solely by sufferance of the Soviet Government, that it is subject to civil direction and ultimate control by the Soviet, and that, during this period of domination, to permit the Patriarchate to exercise jurisdiction over the St. Nicholas Cathedral would involve an impermissible perversion of the implied trust to which it was dedicated.
If Sergei’s acts as Patriarch may be considered equivocal with respect to his relationship with the Soviet, there is no doubt or vacillation in the policies of his successor, Alexei. The best that can be said is that they have preserved the bare existence of the Russian Orthodox Church in Russia and what is called “ freedom of cult ’ ’, i.e., of liturgical observance. This may be no mean accomplishment but it is a far cry from the kind of existence which would permit resumption of administrative control over *211 the Metropolitan District. Plaintiff’s leading witness, a church historian, concluded that “ the fact remains that the Russian Church is subjugated by the state and exploited as a tool for the latter’s far ranging policies ”, a characterization which the Trial Judge himself adopted, as we shall see.
Patriarch Alexei has always appeared to be an ardent supporter of the Soviet State. He was an outspoken admirer ot‘ Stalin, whom he addressed as the “ God-appointed leader ” and to whom he pledged unswerving loyalty. The proceedings of the 1945 sobor which elected him read more like a Communist party rally than the solemn conclave of a major religious faith. He and his official publications have warmly supported the standard Communist “ line ” on various political matters. At appointed times, he and the church have sponsored or supported “ Peace Conferences ” extolling Russia and condemning the West. The journals of the Moscow Patriarchate, which have on occasions been excluded from the United States mails on the ground of constituting political propaganda, are replete with virulent and intemperate attacks upon the Government, people and policies of the United States. Every area of political conflict between the United States and Russia becomes the subject of another tirade, more vicious and more effective for the very reason that it appears in a church publication, under ecclesiastical sanction, and couched in phrases borrowed from the religious lexicon.
Thus, the United States has been castigated as the ‘ ‘ fornicatrix of the resurrected Babylon “ the Washington Cain ”, ‘ ‘ the beast of the Apocalypse ’ ’ and ‘ ‘ the contemporary bloodthirsty Baal ”. All the base lies of Soviet propaganda regarding alleged American germ warfare and mass rape in Korea to imperialist and warmongering designs in the Middle East are duly and faithfully parrotted. ‘ ‘ The great blasphemy from the Christian point of view ’ ’, according to the Moscow Patriarchate, ‘ ‘ is the fact that these [American] people call themselves Christians.”
At the trial, there was evidence that ‘ ‘ freedom of religion ’ ’ in the present Soviet Constitution means merely freedom of “ cult ” or of ritual observance on a parish basis, there being a prohibition against any religious preaching, charitable activity, *212 instruction or training of the young or other “propaganda”. On the other hand, the Soviet Constitution guarantees freedom of antireligious propaganda.
There is also evidence of the Soviet policies with respect to religious bodies as illustrated hy the actions suppressing the Catholic church in Hungary. There, it was shown, the Communists caused the imprisonment and persecution of the clergy, the confiscation of church properties, the requirement of loyalty oaths, and the interpenetration of remaining church offices and institutions hy Communist party representatives who assumed to themselves the powers of decision formerly exercised by bishops and other clerics.
A Russian expert called by plaintiff, based upon his knowledge of the Soviet State, a visit to Russia and his belief that the Soviet Union is a totalitarian society, testified he felt that the conclusion flows that ‘ ‘ as significant an institution as a major church must be very closely watched and supervised by the Soviet State and that the Soviet State would not permit any such significant institution to operate freely, with all the possible consequences that such free operation might raise for the totalitarian state.”
Likewise, the Moscow Patriarchate has embarked upon an aggressive program to establish hegemony over all the other autocephalous Orthodox Churches of the Eastern Confession. There was an ancient Russian ambition to become the inheritor and repository of the Christian tradition and the true center and leader of Christendom. The idea was based upon the notion that both Rome and Constantinople had possessed and then forfeited the mantle of leadership which should thus pass to Russia. The theory embodying the claim was known as “ Moscow-the-Third-Rome ”, and there is evidence that Patriarch Alexei, sub-serving the aims and purposes of the Soviet foreign policy, has become its great modern exponent. Thus, the Moscow Patriarchate has derided the traditional title of the Patriarch of Constantinople as the “ Ecumenical ” Patriarch and has sought to orient all the other Orthodox churches to Moscow instead. Through visits to their countries, through co-operation of the political officials in the satellite Nations of eastern Europe, through subsidies furnished hy the Soviet Government and *213 through infiltration and pressure, the Moscow Patriarchate is making its influence felt throughout the Orthodox world.
Since World War II, the Moscow Patriarchate in its official publication, the Journal of Moscow Patriarchate, and in other forms, has periodically published and disseminated in Russia and throughout the world, including the United States, the pronouncements of its top hierarchs, including Patriarch Alexei and Metropolitan Nicholai, which have followed and supported the Soviet line in international affairs, and have been denunciatory and defamatory of the United States Government and its people and of the allies of the United States.
The Executive Department of the United States Government has on occasions excluded from the mails and the customs various issues of the Journal of the Moscow Patriarchy on the ground that they constitute political propaganda in accordance with the opinion of the Attorney General of the United States of December 10, 1949.
The State Department of the United States has refused to permit Archbishop Boris Vik, the current appointee of the Moscow Patriarchate, to enter the United States to perform his functions.
Finally, the record is replete with instances of political diatribes issued by the Patriarchate in furtherance of the interests of the Soviet State, many of them delivered by Metropolitan Nicholai, second in power to Alexei and considered his probable successor. While it is not and-cannot be in any way dispositive of this appeal, being dehors the record, it may not be amiss at this point to note that, in testimony on May 5, 1959 before the Internal Security Subcommittee of the Judiciary Committee of the United States Senate, Peter S. Deriabian, a former officer of the NKVD, later known as the Ministry of State Security of the Soviet Government, stated that most of the priests of the church in Russia were agents of the secret police, that the seminarians were systematically recruited for this service, and that Metropolitan Nicholai himself is such an agent of the State security apparatus.
Against the foregoing, defendants brought out on cross-examination that, as a matter of history, various ‘1 loyalty ’ ’ oaths had been required by political leaders of bishops in various *214 countries, that the Soviet Government had never attempted to alter the dogma of the church, and that Soviet law does not require that clergymen be approved by the State. These witnesses, however, stated that the Soviet State does interfere in the internal administration of the church and that it had “ committed the .Russian Church to a policy of unconditional fealty and blind support in exchange for precarious recognition ”. Defendants also put on three clergymen affiliated with the Moscow Patriarchate who testified that they had visited Russia, stayed there for a short period, observed churches open, in good physical condition, well attended on occasion and religious articles for sale. One witness also stated that no one had suggested that he should make any commitments to the Soviet Government.
With respect to such evidence, attempted comparisons between the present case and historical instances of church-State relationships in other lands and other times are not determinative of the problem. The situation presented here, created as it was by the Communist revolution, finds no exact parallel in history. Likewise, accounts of apparent religious activity in Russia may show that the church retains existence there but this does not go to the ultimate issue of its domination by the State.
On the whole record, we conclude that the Moscow Patriarchate enjoys at best a nominal and conditional existence, at the sufferance of the Communist rulers of the Soviet State, that the Patriarchate is subject and subordinate to the Soviet Government and required to work for the furtherance of its political aims and objectives in Russia and abroad and that the administration of the church is in the hands of individuals who, through coercion, through employment or through conviction, subserve the paramount interests of the State. On this central issue, we are constrained to disregard any contrary findings of the Trial Justice and as a matter of law act in accordance with the facts as clearly and incontrovertibly demonstrated.
Actually, the Trial Justice himself conceded that the question as to the domination of the Patriarch by the Kremlin had to be found in favor of plaintiff by repeated comment that this condition of subservience now is no worse than that which existed prior to the Communist revolution and under the Czars. Thus, he stated that “ The Russian Church as a tool exploited by the *215 State was no new phenomenon.” That fact being conceded, he then went on to excuse the condition by adding: “ i But so it was under the Tsars ’ ”. He dismissed the Patriarchate’s political expressions and activities in support of the Soviet State as 1 ‘ fulminations of an individual ’ ’; yet at another point he commented that analysis of the testimony of one of plaintiff’s expert witnesses “ reveals no greater, or even as great, a subservience of the church in Russia to the central government as had been acknowledged under the Czarist regimes.”
No other view is possible than that the Russian church is administered as an agency of the Soviet State and we are sure that even our dissenting brethren will agree that no court which sits in judgment on this case can be so naive as to disbelieve, any more than did the trial court, by its own statements, the strong proof that the Patriarch is subservient to the Communist dictatorship in the U. S. S. R. If it be conceded, as it thus is, that the Moscow Patriarchate is subservient to the Soviet State and is a tool exploited by the Communist rulers, it is impossible to excuse that condition on the ground that the former Czar of Russia employed the church as an instrumentality to effectuate the objectives and policies of his government. Common sense tells us that there is an essential and distinguishing difference between the two situations. The Czar did not persecute and harass the church. On the contrary he was a member of the church, a believer of its doctrines, a supporter of its activities and the major source of its revenues. The present Soviet Government is frankly and grossly anti-religious. It attempted to destroy the church and only tolerates it now because it can be useful.
Moreover, the North American Diocese was founded and composed of immigrants from Russia to whom the concept of a divinely appointed Czar was natural and indigenous. There was no incongruity or incompatibility in his close, active and interested participation in the administration of the church and in the corresponding reverence and loyalty accorded him by the faithful. But it passes understanding that anyone can rationally substitute the present atheistic Communist rulers of the Soviet for the Czar of Russia in this picture of church-State relations and conclude that there is no difference between the two. The Czar was sworn to uphold the church; the Com *216 munists are committed to its ultimate destruction. There is an obvious distinction between the civil head of an established or State church sworn to support it, and the appointed agent of the State security system posing as a cleric to effectuate the policies of the State including the ultimate elimination of the very church he subverts.
By reason of this radical change in the nature and operation of the former central church authority in Moscow, the rule of Watson v. Jones {supra) is not applicable with respect to properties of the North American Diocese. As we stated in 306 N. Y. at pages 49-51, and particularly at page 51, there is a basic qualification to the application of such rule. The court must always be careful to ascertain whether the central church authority really exists or enjoys sufficient freedom of action to be able to function as such. The rule may not be applied when it would result in a perversion of the trust to which local church properties were dedicated when, as here, the highest church authority has departed, in a broad, fundamental and substantial manner from the customary organization, operation and doctrine of the church. “In other words, where a property right turns upon a decision of the church authority, the civil court is under a duty, if such issue is raised, to ascertain whether the purported authority is duly constituted and functioning.” (306 N. Y., p. 51.)
The described status and situation of the church in Russia has persisted, without essential change, from the period following the Bolshevik revolution down to the present time. It provided the factual basis for the American declaration of autonomy in 1924 and it provides the factual basis for the continued autonomous administration of the church here with right of local election of bishops.
Under these circumstances, the archbishop elected by the Metropolitan District as representative of those for whom the property was originally dedicated and as the trustee * ‘ ‘ who may be relied upon to carry out more effectively and faithfully the purposes of this religious trust’” (306 N. Y., pp. 52-53) is entitled to the use and occupancy of St. Nicholas Cathedral. To hold otherwise, at least as long as the present picture persists of Patriarchal domination and interpenetration by hostile and antireligious civil authorities, and to award the cathedral to an *217 appointee of the Moscow Patriarchate, under present conditions, would involve a violation of the constitutional protection against State interference in the free exercise of religion. As stated in the Trutza case (205 F. 2d 107, 112, supra): “ Since this is true as to protection against the interference of an individual American state, we think it should be equally true as to protection against the domination and interference of a foreign state.”
The First Amendment would nullify identification of a church with the Government of the United States or of a State. We do not understand on what principle it is supposed to sanctify the identification of a church with a foreign State. An act of the Legislature was considered to be necessary in the beginning to permit the incorporation here of Russian churches at the instance of the envoy extraordinary and minister plenipotentiary of Russia to the United States and the Consul General here (L. 1871, ch. 12; Stokes, Church and State in the United States, Yol. 3, p. 359). There can hardly be a constitutional mandate requiring that foreign States shall be allowed to administer churches in the United States. The extent of the establishment of a church by a foreign government having this result may be a matter of degree, but where the identification is as complete as it is held to be in this case, we think that the First Amendment forbids a new foreign government to take over the administration of existing church property here in the interest of its own temporal power and against the wishes of the members of the church here. Even if this be not so, the First Amendment does not stand in the way of the -judicial requirement under the principles of equitable jurisdiction that the property of a religious society shall be administered according to the purposes to which it has been dedicated. Every naturalized citizen of the United States is required to take an oath of allegiance whereby he expressly renounces and abjures all allegiance to any foreign prince, potentate or power. Native citizens are bound to the same renunciation. Can this solemn obligation be circumvented if the foreign power operates in this country through a branch of the State bearing the name of a church — even the name of a church that is old and respected? With all but unanimity the members of that church in this country have said no. It would be strange if our fundamental law, while *218 ordering the separation of church and State, were so awkward an instrument that in functioning it has to produce an opposite result from that at which it aims.
One final word may be said. Our decision does not involve interference with the right of any religious organization to select or appoint its clergy. No one disputes that the Patriarchate as now constituted may appoint and dispatch an archbishop here to minister to those in this country who may still acknowledge the administrative rule of the Patriarch of Moscow. No one disputes that such an archbishop may establish and maintain churches here under the full protection of our constitutional guarantees of freedom of religion. What we do hold is that the appointees of the Patriarchate, by virtue of its radically changed status since 1918, may not assume control of property in this State, such as St. Nicholas Cathedral, which is dedicated to the use of the former North American Diocese and, now, the Metropolitan District.
Moreover, we do not consider our decision to be in conflict with the Kedrojf decision of the Supreme Court (supra). As the Court of Appeals stated in the Trutza case (205 F. 2d, supra, p. 110): “Here no ordinance, statute or congressional enactment is involved. This is not a case of legislation claimed to be violative of the First Amendment to the Constitution of the United States. It is a controversy between the American and Canadian church group and the Communistic government in Romania working through the hierarchy.”
The judgments appealed from should be reversed and judgment directed for plaintiff, with costs.