SAINT NICHOLAS CATHEDRAL OF THE RUSSIAN ORTHODOX CHURCH IN NORTH AMERICA, Plaintiff, *v.* JOHN KEDROFF and BENJAMIN FEDCHENKOFF, as Archbishop of the Archdiocese of North America and the Aleutian Islands of the Russian Orthodox Greek Catholic Church, Defendants.

Supreme Court, Trial Term, New York County, February 18, 1948.

*Ralph Montgomery Arkush* and *Robert H. Kilroe* for plaintiff.

*Philip Adler* for defendants.

BOTEIN, J. In 1925, the Appellate Division of this Department held that one John S. Kedrovsky was the accredited Archbishop of the North American Diocese of the Russian Orthodox Church and as such entitled to occupy the Cathedral of St. Nicholas in New York (*Kedrovsky* v. *Rojdesvensky,* 214 App. Div. 483). Its determination was affirmed without opinion by the Court of Appeals (242 N. Y. 547).

Kedrovsky had sought to prevent the defendant Rojdesvensky, who likewise claimed a valid appointment as Archbishop of the North American Diocese, from occupying the Cathedral. The complaint asserted that the defendants were not the archbishop and dean of the church, and that by their occupancy they were diverting the property of the church from the trust to which it was subject, that is, occupancy by the accredited archbishop and dean. The complaint took the form of an action for the enforcement of the trust upon the real property occupied by the defendants.

In arriving at this decision the Appellate Division found that none of the bodies purporting to recognize Rojdesvensky as an archbishop was shown to have had any authority to appoint an archbishop. The court, on the other hand, found that Kedrovsky was appointed by the Holy Synod and that this body derived its powers to make a valid appointment from a legally

convoked Sobor, or ecumenical convention of the church, held in Moscow in 1923. " As to Kedrovsky's authorizations from the Holy Synod there is no dispute whatever. The Holy Synod has authority to appoint an Archbishop for North America and a delegate of the Holy Synod " (p. 488).

The court therefore concluded (p. 489): " To set aside the actions of the second Sobor under these conditions in favor of the shadowy claim of the defendant Rojdesvensky, on the theory that the doctrinal necessities of the Russian Church require it, would put a civil tribunal of New York in ascendancy over the ecclesiastical authority in the decision of a purely ecclesiastical question with which it can have no concern."

In making this determination, the courts were applying well-defined principles enunciated in the leading cases of *Watson* v. *Jones* (13 Wall. [U. S.] 679) and *Trustees of Presbytery* v. *Westminster Church* (222 N. Y. 305). Each of these cases, as well as the instant one, grew out of a schism " which has divided the congregation and its officers, and the presbytery and synod, and which appeals to the courts to determine the right to the use of the property so acquired (*Watson* v. *Jones, supra,* p. 726). Both leading cases, as well as the instant one, involved the third of the three classes of cases discussed in *Watson* v. *Jones.* " It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government " (p. 726).

In laying down the rule governing such cases, the Supreme Court, in *Watson* v. *Jones,* avowedly departed from the doctrine of the English courts. It held: " In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (p. 727.) " It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." (p. 729.)

In *Trustees of Presbytery* v. *Westminster Church* (*supra*) the Court of Appeals rejected " the claim of defendants in substance that they will be obeying all the requirements of denomination uses if they devote the property in their custody to the observance and propagation of what may be regarded as the general, fundamental principles of the Presbyterian faith, although they secede from the church organization at large with which they have been affiliated and utterly refuse to obey its government or be bound by its rules and regulations " (p. 313). The court went on to say: " Expressed in another form defendants' claim is that they can utilize the church property of which they hold title for the maintenance and support of an ' independent ' Presbyterian church — a church free from and independent of any government or control of the Church at large. * * * We do not accept this view."

The opinion rendered in *Kedrovsky* v. *Rojdesvensky* (214 App. Div. 547, *supra*), over twenty years ago, while not citing these authorities, groups itself logically in the pattern they set. It simply directed that occupancy of a cathedral built in 1903, for a diocese established in 1793, with funds furnished in large part by the Russian Orthodox Church in Russia, should be given to an archbishop duly appointed by that church — not to an archbishop deriving his authority from a convention held in Detroit in 1924, which, as the court put it, " purported to secede from the Russian Church and to make Rojdesvensky archbishop of an independent church " (p. 487).

It is in this setting that we must consider the facts which have transpired in the ensuing twenty-odd years and which have led to the institution of this lawsuit.

Following final court determination of his right to occupancy, Kedrovsky entered into possession of the cathedral. The plaintiff corporation, which was incorporated by special act of the Legislature in 1925, and claims legal title to the cathedral, permitted him to remain in possession until his death in 1934. The plaintiff corporation likewise made no effort to oust Kedrovsky's son, Michael J. Kedroff, who claimed to have succeeded him as ruling archbishop, and he remained in possession until his death in 1944. During this period the breach still existed between those who acknowledged the spiritual leadership of the patriarch in Moscow, but who asserted and maintained autonomy in all other regards, and those who subscribed to the administrative as well as spiritual leadership of the patriarch and holy synod. The head of the first group is Metropolitan

Theophilus; the latter group is headed by the defendant Metropolitan Benjamin.

This is an action in ejectment, tried before the court without a jury. The plaintiff, claiming to be the owner in fee, seeks immediate possession of the cathedral, which it asserts is being unlawfully withheld from it by the two defendants. We need only determine the rights of one defendant, Metropolitan Benjamin, as the other defendant concededly derives whatever rights he might possess through the former.

The defendant, by way of separate defenses, alleges that as accredited Archbishop of the North American Diocese he is entitled to possess, occupy and use the premises, that the plaintiff has no authority to bring this action, and that the action is barred by the Statute of Limitations and by the plaintiff's laches. At the conclusion of the trial the defendant also urged that the plaintiff's title to the property involved is defective and that it had failed to prove the necessary ingredients of an action in ejectment.

Ejectment is a proper form of action for the determination of the right of possession of property held or claimed by a religious corporation (*Westminster Presbyterian Church* v. *Trustees of Presbytery,* 170 App. Div. 439). The plaintiff in this case holds title to the cathedral for the benefit of the North American diocese and of the ecclesiastical dignitaries entitled to possession (*Kedrovsky* v. *Rojdesvensky, supra*). It, by its trustees or officers, may bring an action in ejectment when, as claimed here, the persons entitled to possession are alleged to have been unlawfully ousted and refused re-entry. "The trustees obviously hold possession for the use of the persons who by the constitution, usages, and laws of the Presbyterian body, are entitled to that use. * * * They have no personal ownership or right beyond this, and are subject in their official relations to the property, to the control of the session of the church." (*Watson* v. *Jones, supra,* p. 720.) "They [the defendants] should be compelled to recognize these rights, and permit those who are the real beneficiaries of the trust held by them, to enjoy the uses, to protect which that trust was created." (p. 721.)

The one issue which looms large in this case is whether, as asserted by the plaintiff, Metropolitan Theophilus is the accredited head of the church in North America, or whether, as claimed by the defendant Metropolitan Benjamin, he is that head.

The facts in this case parallel, with a fidelity seldom encountered in litigation, the facts in the *Kedrovsky* case. The holy synod was there held to have had the authority to appoint the ruling archbishop and there was no dispute as to Kedrovsky's authorization from that church body. Likewise, there is no dispute in this case that the defendant Metropolitan Benjamin was duly appointed by the patriarch and Holy Synod as ruling archbishop in 1934, following Kedrovsky's death. It was also held that the group which " purported to secede from the Russian Church and to make Rojdesvensky Archbishop of an independent church " had no authority to appoint the ruling archbishop. It is this same group which now purports to designate Metropolitan Theophilus as ruling archbishop and the plaintiff corporation, by virtue of such designation, seeks judgment which in effect would secure possession of the cathedral for Metropolitan Theophilus.

The plaintiff has, at least inferentially, assailed the soundness of the findings made by the Appellate Division in the *Kedrovsky* case as to the canonical validity of Kedrovsky's appointment and the invalidity of Rojdesvensky's purported appointment, and asks this court, in substance, to distill different findings from substantially the same evidence that was submitted in the earlier case. This, of course, may not be done, and the inexorable parallel between the *Kedrovsky* case and the instant case would seem immediately to require judgment for the defendant. However, intervening legislation must first be considered.

In 1945, the new article 5-C of the Religious Corporations Law (L. 1945, ch. 693) relating to Russian Orthodox churches was enacted. This statute constitutes a legislative recognition of the historical fact that since 1924, a representative group of Russian Orthodox churches, formerly subject to hierarchical administrative and spiritual control of the sacred synod, have asserted their administrative autonomy and have organized an independent Russian church in America. Accordingly, the statute defines the " Russian Church in America " and a " Russian Orthodox Church " (§ 105), provides for the incorporation of a Russian Orthodox Church (§ 106), the management of its affairs and property (§ 107) and reincorporation of existing incorporated Russian churches as newly incorporated Russian Orthodox churches (§ 108).

There is nothing in the statute which indicates a legislative intent to accomplish a transfer of property of all Russian Orthodox Churches in this country to the use of the newly

recognized " Russian Church in America." There are no legislative findings accompanying article 5-C which might be expected were that the Legislature's intent. It contains none of the bluntness and direct statement of an expropriation statute such as the Act of Congress of 1887 recited in *Mormon Church* v. *United States* (136 U. S. 1).

It is urged that the statute inferentially provides for the dedication and use of the property of *all* Russian Orthodox churches for the benefit of and at the direction of the Russian Church in America. While the statute so states (§ 107) it is limited by the definition in section 105 preceding which defines a Russian Orthodox church as one " founded and established for the purpose and with the intent of adhering to, and being subject to the administrative jurisdiction of * * * the Russian Church in America." When St. Nicholas Cathedral was " founded and established " there. could have been neither " purpose " nor " intent " to adhere and to be subject to the " Russian Church in America ", for that church was not then factually in existence.

All that the new article 5-C accomplished was to provide a framework for jurisdiction and authority over churches and their property in accordance with the rules, regulations and usages of the Russian Church in America (§ 107), applicable only to Russian Orthodox churches which might thereafter be organized (§ 106) or which, having theretofore been incorporated, should thereafter be reincorporated (§ 108). Since St. Nicholas Cathedral falls within neither of these categories, it follows that its use is not subject to the direction of the Russian Church in America.

This conclusion as to the scope of Article 5-C of the Religious Corporations Law makes it unnecessary to consider the question of the constitutionality of the statute as violative of " due process " in effecting a transfer of property.

Judgment is accordingly directed for the defendants. Suggestions as to the form and subject matter of the judgment will be entertained upon settlement of the judgment. Settle judgment.