226 So.2d 632

The **FIRST METHODIST CHURCH OF UNION SPRINGS, Alabama, et al.**

v.

**Haywood Lynn SCOTT et al.**

**4 Div. 269.**

Supreme Court of Alabama.

Sept. 4, 1969.

Frank Dominick, Birmingham, Alto V. Lee, III, Dothan, and Albert W. Copeland, Montgomery, for appellants.

Albert F. Simpson, Jr., Eufaula, for appellees.

COLEMAN, Justice.

Complainants appeal from a decree denying relief to complainants and declaring that respondents have title to the real estate involved in the suit, impressed, however, with a trust for religious uses.

The record contains more than five hundred pages. Exhibits include four books, to wit: Doctrines and Discipline of the Methodist Church, 1960; idem, 1962; Journal of the Alabama-West Florida Conference, 1963; and 1960 Journal of the 1960 General Conference of the Methodist Church. These exhibits embody more than three thousand printed pages. There are also other papers and manuscripts which include several hundreds of pages. The briefs cover approximately one hundred forty typewritten pages.

The question for decision, however, is whether a certain act of the Legislature violates the First Amendment to the Constitution of the United States. To shorten this opinion as far as practicable, we undertake to state the case by copying and paraphrasing extensively from appellants' statement of the case. Appellees say in their brief: "Appellants' statement of the case is substantially correct."

*Statement of the Case.*

The case arises from an unfortunate schism in the membership of the First Methodist Church of Union Springs, hereinafter referred to as First Methodist, which is a local congregation of The Methodist Church. In November, 1963, a majority of the members of the local congregation ("ninety-four and six tenths per cent of the residential, adult membership") withdrew from membership in The Methodist Church and affiliated themselves with the Southern Methodist Church, a denomination separate and distinct from the Methodist Church. The majority group incorporated themselves as Union Springs Southern Methodist Church of Union Springs, Alabama; sometimes herein referred to as Southern Methodist.

Complainants are certain officials of The Methodist Church and also the minority group of the local congregation who remain loyal to The Methodist Church.

Respondents are the officials and proper representatives of the majority group and of Southern Methodist.

There is no dispute as to complainants and respondents constituting the proper parties. Complainants recognize that respondents have the unquestioned right to terminate their membership in The Methodist Church with or without any reason or cause. Complainants say in brief:

"  .   .   .   . Rather, the questions presented by this appeal relate to whether persons who have so terminated their membership in the religious society are entitled to retain possession of the real and personal property of the local church."

After withdrawing from The Methodist Church, respondents took possession of the real estate used by the local church as a place of worship, the parsonage, and also personal property used in connection with the real estate.

Complainants commenced this suit to recover possession of the real estate. The bill of complaint appears to have been regarded as one to enforce the rights claimed by complainants to enforce a trust. No question is raised as to the right of complainants to proceed in equity.

"This protective jurisdiction of equity may be invoked by members, or by representative officers of the church, or both, who would protect the trust property from diversion to another purpose. (Citations Omitted)" Morgan et al. v. Gabard et al., 176 Ala. 568, 575, 58 So. 902, 904.

Complainants aver that the title is in the trustees of First Methodist, who are parties complainant. It appears that, in 1860, the land, on which the church building is located, was conveyed by deed to certain persons therein named,

" . . . . and their successors in office forever. in fee simple in trust that they may erect and build or cause to be erected and built thereon a house or place of worship for the use of the members of the Methodist E. South (sic) according to the rules and discipline which from time to time shall be agreed upon and adopted by the ministers and preachers of the said church at the general conference and in further trust and confidence that they shall at all times forever hereafter permit ministers and preachers belonging to the said church as shall from time to time be duly authorized by the general conference of the ministers and preachers of said M. E. Church South or by the annual conference authorized by said general conference to preach and explain God's Holy Word therein . . . . "

The land on which the parsonage is located was conveyed in 1948 to: "The Board of Trustees of the Union Springs Methodist Church." The habendum clause is to said Board, " . . . . their heirs and assigns in fee simple FOREVER." We find

no declaration of an express trust. The parties make no distinction between the two deeds, however, and we make none. Appellants say in brief, " . . . . the answer to the bill of complaint admits that it (the parsonage lot) is subject to the trust provisions set out in the Discipline of the Methodist Church . . . . " (Par. Supplied)

The First Methodist Church of Union Springs continues to exist and is subject to the Annual Conference of the Alabama-West Florida Conference of The Methodist Church and is now being served by a pastor of The Methodist Church.

Respondents allege in cross bills and contend that they are entitled to possession and ownership of the land here involved by virtue of Act No. 79, approved August 14, 1959, page 257; which appears in Pocket Parts, 1958 Recompiled Code, as Title 58, §§ 104–113.

Act No. 79 is entitled:

## "AN ACT

"To protect and preserve basic trust and fiduciary purposes and interests inherent in the intent and understanding when property in Alabama shall have been subjected or devoted to local church, charitable or educational uses; to prevent impairment of such intent and to preserve the charitable or trust use intended, from subjection to uses, functions or doctrines subversive of such intent or inconsistent with social order, harmony and good will in the administration thereof as a result of or in the event of action by any higher or affiliate church or other authority affecting the administration or use of the property; and to provide for repayment of unsecured loans or grants made by the parent church (or its affiliated organizations) to the local church as those terms are herein defined; and to provide procedure for protection and preservation of such intent, and the

religious, charitable or educational use involved, and for declaratory action to that end."

"Majority group" is defined as "sixty-five per centum or more of membership resident in Alabama, enrolled in any local protestant church," not including minors.

"Local church" is defined as any church of the protestant faith which holds title to or trust interest in property and is affiliated with or recognizes the doctrinal, religious, administrative, jurisdictional, ecclesiastical, or other superior authority of a larger denominational or ecclesiastical body.

"Parent church" means the larger body or authority having jurisdiction over such local church.

"Trust clause" means any clause inserted in a deed or instrument, or which is required by law of the parent church to be so inserted, providing that property acquired by the local church, or in the name of trustees for use of the local church, shall be held in trust for the parent church substantially as follows:

"In trust, that said premises shall be used, kept and maintained as a place of divine worship of the parent church, or as a place of residence for the use and occupancy of ministers of the parent church, subject to the discipline, usage and ministerial appointments of said church as from time to time authorized and declared by the law-making bodies of the parent church."

Paragraph (g) of Section 1 recites:

"(g) Change of social policies means any substantial and material change in or departure from the discipline, social creed, jurisdictional system, authoritative pronouncements or other church law relating to the social standards, practices or policies of the parent church or its affiliated institutions, as the same existed at the time of affiliation or merger of the local church with the parent church, and which change is contrary to the way of life of the majority group."

Section 2 of the act recognizes and declares that the majority group of any local church, owning title to or interest in church property, has a right and equity to prevent church property held subject to the trust clause from being converted to or used for an unintended or different use due to a change of social policies of the parent church. Section 2 further provides that the majority group has the right and equity to be relieved of a material departure from the understanding of such local church, or majority group, with respect to use of church property, or the conduct of traditional social practices due to a change of social policies of the parent church.[1]

Section 3 provides that the majority group may withdraw from the parent church and thereupon be permitted to devote the church property to the uses originally intended in the trust clause. It is provided that the act is not intended to control any doctrine or social practice of the parent church and one of the purposes of

---

1. Section 2 recites:
"Section 2. The right and equity are hereby recognized and declared on behalf of the majority group of any local church owning title to or an interest in church property, to preserve and protect the same from impairment or loss, and to prevent church property held subject to the trust clause from being converted to or used for an unintended or different use or purpose, due to a change of social policies of the parent church; and to be relieved of a material miscarriage of intent or understanding, or failure of or departure from the intent or understanding of such local church, or the majority group thereof, with respect to its use of the church property, or the conduct of its traditional social practices due to a change of social policies of the parent church or of any one or more of its affiliated organizations."

the act is to afford an effective remedy for protection of the trust property from impairment or loss when the intended trust use is threatened by action of the parent church inconsistent with the basic intent expressed in the dedication thereof.

The act further provides for implementation thereof by suit in equity.

Complainants contend that Act No. 79 violates the First Amendment to the Constitution of the United States.[2] The Supreme Court of the United States has said:

"  .  .  .  . The First Amendment, as made applicable to the states by the Fourteenth, Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 872, 87 L.Ed. 1292, 146 A.L.R. 81, commands that a state 'shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . .' . . . ." Everson v. Board of Education, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed. 711.

The question of constitutionality of Act No. 79 is raised by the trial court's action in overruling demurrer to the cross bills and in the express finding that the act is not unconstitutional. We next consider the errors argued by complainants.

### Insufficiency of Evidence.

Complainants contend that the evidence shows that respondents failed to follow the procedure for withdrawal prescribed by Act No. 79 and that the evidence is not sufficient to support a finding that The Methodist Episcopal Church South adhered to the policy of racial segregation prior to union with other churches to form The Methodist Church. Complainants argue that respondents are not entitled to the benefit of Act No. 79 because respondents have failed to prove that the parent church changed its social policy; that the policy

was never racial segregation; and, therefore, there has been no policy change. Respondents say in brief:

"Prior to the Merger of the various Methodist denominations in 1939, the Methodist Episcopal Church, South, in fact, if not by specific church law, practiced racial segregation in its Alabama congregations.

"At the time of the Merger, the policy of racial segregation, in fact, was continued into the resulting organization, The Methodist Church, through the device of the central jurisdiction; was the reason for the establishment of the central jurisdiction; and was the practical policy of The Methodist Church during its early years.

"During the 1950's, the policy of The Methodist Church, as evidenced by its publications and the pronouncements of its hierarchy, gradually swung toward a favoring of racial integration.

"This change in policy on the part of The Methodist Church caused much anguish among the Methodist congregation at Union Springs, Alabama, and led to a determination by the minister of that congregation and the overwhelming majority of the lay members of the congregation that the change which had occurred in the practical policy of The Methodist Church was contrary to the basic understandings and assumptions under which the congregation had existed and that acquiesience therein would be contrary to the welfare of their church and would be inconsistent with the effective and harmonious continuation of church work.

"The result was that the minister, one of the Respondents and Appellees in this case, and 94.6% of the congregation withdrew from their connection with The

2. "Congress shall make no law respecting an establishment of religion, or prohibit- ing the free exercise thereof; . . .." Amendment I.

Methodist Church but continued to use the property as they had always done.

"  .   .   .   .   .   .

"Appellants are apparently attempting, as they did in the trial court, to make a meaningful distinction between what the church actually did, as a matter of fact, with great consistency, year after year, and what the written law of the church specifically said. The trial judge accepted and considered testimony of the actual policy of the church  .  .  .  . "

■ Respondents point out that the errors thus assigned assert an insufficiency of the evidence to support a finding and that complainants have not set out in their brief a condensed recital of the evidence given by each witness as required by Supreme Court Rule 9. Respondents' point is well taken. The assignments challenging the sufficiency of evidence will be treated as waived. Limbaugh v. Comer, 265 Ala. 202, 90 So.2d 246; Mothershed v. Mothershed, 274 Ala. 528, 150 So.2d 372; Employers Ins. Co. of Alabama v. Watkins, 280 Ala. 681, 198 So.2d 258; and authorities therein cited.

### Constitutionality.

■ We are mindful of the admonition to appellate judges that:

"  .   .   .   . We may not draw on our merely personal and private notions and disregard the limits that bind judges in their judicial function.  .  .  .  .

"  .   .   .   . To practice the requisite detachment and to achieve sufficient objectivity no doubt demands of judges the habit of self-discipline and self-criticism, incertitude that one's own views are incontestable and alert tolerance toward views not shared.  .  .  .  . " Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396, 1402.

As we are bound to do, we undertake to decide the causes placed before us according to the limits the law places on us. Among those limits are decisions of the Supreme Court of the United States . declaring the meaning and effect of the First Amendment to the Constitution of the United States.

In order to support their contention that Act No. 79 violates the First Amendment, complainants rely on Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120, which arose in New York and was a contest for the right to possess and use St. Nicholas Cathedral in that city. In the decision last cited, the Supreme Court of the United States held that a law passed by the Legislature of the State of New York violated the First Amendment.

The St. Nicholas cases began at least as far back as 1924. Kedrovsky v. Rojdesvensky, 123 Misc. 159, 204 N.Y.S. 442. There may be some earlier decisions reported and some later ones which we have not found. We have found the following: Kedrovsky v. Rojdesvensky, 214 App.Div. 483, 212 N.Y.S. 273; Kedrovsky v. Rojdesvensky, 242 N.Y. 547, 152 N.E. 421; Kedrovsky v. Archbishop & Consistory, etc., 249 N.Y. 75, 162 N.E. 588; St. Nicholas Cathedral v. Fedchenkoff, 192 Misc. 327, 77 N.Y.S.2d 333; St. Nicholas Cathedral v. Kedroff, 276 App.Div. 309, 94 N.Y.S.2d 453; St. Nicholas Cathedral v. Kedroff, 302 N.Y. 1, 96 N.E.2d 56.

The St. Nicholas cases resulted from a schism in the American membership in the Russian Orthodox Church. The schism was a result of the 1917 revolution in Russia. Prior to the revolution, the North American Diocese of the Russian Orthodox Church had existed in America for more than a century. The cathedral had been built 'y the Russian Orthodox Church in 1903 and, in 1905, became a cathedral occupied by the ruling bishop, called Archbishop of the North American Diocese. The cathedral was dedicated to the use of all the members of the diocese as a central

place of worship of the Russian Orthodox Church in North America.

The Archbishop was appointed by the head of the church in Russia. The ruling authority had been the Patriarch in Moscow, and at some times had been a sobor or convention of bishops in Russia.

When the Communists gained control of Russia and of the church in Russia, the American members called a sobor which was held in Detroit in 1924. The sobor adopted resolutions and took steps which resulted in the creation of the Russian Church in America. The Russian Church in America retained spiritual connection with the church in Russia but asserted administrative autonomy and the right to possess and use the property which had formerly been subject to administrative control of the archbishop appointed by the head of the church in Russia. St. Nicholas Cathedral was part of that property.

The New York Legislature passed a statute purporting to give the American Church control of the properties of the Russian Church. The American Church had been incorporated. The authorities of the American Church claimed the right to possess and use St. Nicholas Cathedral, pending reunion with the mother church, by virtue of the New York statute.

In the case last cited, 302 N.Y. 1, 96 N.E. 2d 56, the Court of Appeals of New York awarded the cathedral to the American group and said:

"  .   .   .   .   The Legislature has made a determination that the 'Russian Church of America' was the one which, to use our words in 249 N.Y. at pages 77–78, 162 N.E. at page 589, was the trustee which 'may be relied· upon to carry out more effectively and faithfully the purposes of this religious trust (Carrier v. Carrier, 226 N.Y. 114, 123 N.E. 135)' by reason of the changed situation of the patriarchate in Russia. No purpose

would be served by repeating all the circumstances which forced the North American church to declare its temporary autonomy, and the process by which the Moscow Patriarchy has been subjugated by the Russian Government and used as its tool. All that has been detailed fully above. These facts must be deemed to have been found by and to have been within the actual knowledge of the Legislature when it decided to act in 1945 and 1948. . . . . " (302 N.Y. at 30, 96 N.E.2d at 72)

Referring to the corporation, which represented the American Church and was plaintiff in the case, the New York Court said further:

"It is clear, therefore, that the plaintiff corporation and the autonomous metropolitan district which it represents, must prevail in this action in accordance with the legislative finding and mandate and be reinvested with the possession and administration of the temporalities of St. Nicholas Cathedral." (302 N.Y. at 33, 96 N.E.2d at 74)

The parties representing the Russian Church appealed to the Supreme Court of the United States where the judgment was reversed. The Supreme Court of the United States said:

"  .   .   .   .   Certainly a legislature is free to act upon such information as it may have as to the necessity for legislation. But an enactment by a legislature cannot validate action which the Constitution prohibits, and we think that the statute here in question passes the constitutional limits. We conclude that Article 5–C undertook by its terms to transfer the control of the New York churches of the Russian Orthodox religion from the central governing hierarchy of the Russian Orthodox Church, the Patriarch of Moscow and the Holy Synod, to the governing authorities of the Russian Church in America, a church organization limited to the diocese of North

America and the Aleutian Islands. This transfer takes place by virtue of the statute. Such a law violates the Fourteenth Amendment. It prohibits in this country the free exercise of religion. Legislation that regulates church administration, the operation of the churches, the appointment of clergy, by requiring conformity to church statutes 'adopted at a general convention (sobor) held in the City of New York on or about or between October fifth to eighth, nineteen hundred thirty-seven, and any amendments thereto,' note 3, *supra,* prohibits the free exercise of religion. Although this statute requires the New York churches to 'in all other respects conform to, maintain and follow the faith, doctrine, ritual, communion, discipline, canon law, traditions and usages of the Eastern Confession (Eastern Orthodox or Greek Catholic Church),' this conformity is by legislative fiat and subject to legislative will. Should the state assert power to change the statute requiring conformity to ancient faith and doctrine to one establishing a different doctrine, the invalidity would be unmistakable.

"Although § 5 of the Religious Corporation Law' had long controlled religious corporations, the Court of Appeals held that its rule was not based on any constitutional requirement or prohibition. Since certain events of which the Court took judicial notice indicated to it that the Russian Government exercised control over the central church authorities and that the American church acted to protect its pulpits and faith from such influences, the Court of Appeals felt that the Legislature's reasonable belief in such conditions justified the State in enacting a law to free the American group from infiltration of such atheistic or subversive influences.

"This legislation, Art. 5–C, in the view of the Court of Appeals, gave the use of the churches to the Russian Church in America on the theory that this church would most faithfully carry out the purposes of the religious trust. Thus dangers of political use of church pulpits would be minimized. Legislative power to punish subversive action cannot be doubted. If such action should be actually attempted by a cleric, neither his robe nor his pulpit would be a defense. But in this case no problem of punishment for the violation of law arises. There is no charge of subversive or hostile action by any ecclesiastic. Here there is a transfer by statute of control over churches. This violates our rule of separation between church and state. That conclusion results from the purpose, meaning and effect of the New York legislation stated above, considered in the light of the history and decisions considered below." (344 U.S. at 106, 107, 108, 109, 110, 73 S.Ct. at 149, 150, 151)

After reversal and remandment, the Court of Appeals of New York ordered a new trial, on common law grounds, at which findings might be made and discretion exercised, concerning " . . . . the existence and status of the central church authorities in Moscow and their ability to carry out effectively and faithfully the purposes of the religious trust." St. Nicholas Cathedral v. Kedroff, 306 N.Y. 38, 47, 114 N.E.2d 197, 202; St. Nicholas Cathedral v. Kreshik, 9 Misc.2d 1069, 166 N.Y.S.2d 245, 247.

After trial in the New York courts, 9 Misc.2d 1069, 166 N.Y.S.2d 245, supra; 6 A.D. 866, 176 N.Y.S.2d 226; the case again reached the New York Court of Appeals where the use of the cathedral was again awarded to the American group. St. Nicholas Cathedral v. Kreshik, 7 N.Y. 2d 191, 196 N.Y.S.2d 655, 164 N.E.2d 687.

Appeal was taken to the Supreme Court of the United States, where the judgment was reversed June 6, 1960, with the result that the cathedral was again awarded to the Russian group. The court said:

"As the opinions of the Court of Appeals make evident, compare 302 N.Y., at pages 29–33, 96 N.E.2d 56, at pages 72–

74, with 7 N.Y.2d at pages 209–216, 196 N.Y.S.2d at pages 667–673, 164 N.E. 2d at pages 696–700, the decision now under review rests on the same premises which were found to have underlain the enactment of the statute struck down in *Kedroff*. 344 U.S. at pages 117–118, 73 S.Ct. at page 155. But it is established doctrine that '[i]t is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize.' N. A. A. C. P. v. State of Alabama ex rel. Patterson, 357 U.S. 449, 463, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488. See Shelley v. Kraemer, 334 U.S. 1, 14– 16, 68 S.Ct. 836, 842–843, 92 L.Ed. 1161, and cases there cited. Accordingly, our ruling in *Kedroff* is controlling here, and requires dismissal of the complaint." Kreshik v. St. Nicholas Cathedral, 363 U.S. 190, 191, 80 S.Ct. 1037, 1038, 4 L.Ed. 2d 1140.

So far as we are advised, the last cited case ended the litigation. The court held the New York statute invalid because it " . . . . undertook by its terms to transfer the control of the New York churches of the Russian Orthodox religion from the central governing hierarchy of the Russian Orthodox Church . . . . to the governing authority of the Russian Church in America . . . . Such a law violates the Fourteenth Amendment. It prohibits in this country the free exercise of religion." (344 U.S. at 107, 73 S.Ct. at 150)

By the terms of the 1860 deed and by the rules of The Methodist Church, as we think it is conceded by all parties herein, control of the Union Springs property was conveyed to the heirarchy of The Methodist Church subject to the trust for religious use.[3] Act No. 79 transfers control of local church property from the hierarchy to a majority composed of 65% or more of the adult members of the local church. We do not think it can be doubted that the decisions of the Supreme Court of the United States in 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 and 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140, supra, hold that a statute such as Act No. 79 violates the First Amendment guarantee of religious freedom. We are bound by the decisions last cited, and, accordingly, we hold that Act No. 79 is unconstitutional and invalid as applied in the instant case.

We have carefully considered the authorities cited by respondents, including Watson v. Garvin, 54 Mo. 353, and the criticism therein of Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666. The later *St. Nicholas* cases, however, are controlling.

3. We quote from Doctrines and Discipline of The Methodist Church, 1960:

"¶ 22. Art. II.—The Annual Conference is the basic body in the church, and as such shall have reserved to it the right to vote on all constitutional amendments, on the election of ministerial and lay delegates to the General and the Jurisdictional or Central Conferences, on all matters relating to the character and conference relations of its ministerial members, and on the ordination of ministers, and such other rights as have not been delegated to the General Conference under the Constitution, with the exception that the lay members may not vote on matters of ordination, character, and conference relations of ministers. It shall discharge such duties and exercise such powers as the General Conference under the Constitution may determine."

"¶ 45. DIVISION FIVE. AMENDMENTS

" . . . . . . . .

"Art. II.—The bishops shall be elected by the respective Jurisdictional and Central Conferences and consecrated in the historic manner of episcopal Methodism at such time and place as may be fixed by the General Conference. (December 15, 1943.)"

"¶ 361. District superintendents are to be chosen and appointed by the bishop. (See ¶ 432.3.)"

"¶ 351. A pastor is a preacher who, by appointment of the bishop or the district superintendent, is in charge of a station or circuit."

The decree appealed from is reversed and the cause remanded.

Reversed and remanded.

All the Justices concur except SIMP-SON, J., not sitting.